IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


DEBORAH WESTWOOD; MITCHELL                09-CV-478-BR
MYERS; and PETAL PUSHERS &
MORE, LLC, an Oregon limited              OPINION AND ORDER
liability company, doing
business as NOOKIE'S BISTRO &
SPIRITS,

          Plaintiffs,

v.

CITY OF HERMISTON, DANIEL
COLOUMBE, and CHRIS WASHBURN,

          Defendants.


JUDY DANELLE SNYDER
1000 S.W. Broadway
Suite 2400
Portland, OR 97205
(503) 228-5027

W. EUGENE HALLMAN

1 - OPINION AND ORDER

**BRIAN C. DRETKE**
Hallman & Dretke
104 S.E. Fifth Street
P.O. Box 308
Pendleton, OR 97801
(541) 276-3857

**JUSTIN J. BURNS**
104 S.E. Fifth Street
P.O. Box 429
Pendleton, OR 97801
(541) 278-8110

       Attorneys for Plaintiffs

**STEVEN A. KRAEMER**
**KARI A. FURNANZ**
**LESLIE ANNE EDENHOFER**
Hoffman Hart & Wagner, LLP
1000 S.W. Broadway
20th Floor
Portland, OR 97205
(503) 222-4499

       Attorneys for Defendants City of Hermiston and Daniel
       Coulombe


**BROWN, Judge.**

    This matter comes before the Court on Defendants' Motion
(#92) for Summary Judgment.

    For the reasons that follow, the Court **GRANTS** Defendants'
Motion.


## FACTUAL BACKGROUND

    The following facts are undisputed unless otherwise noted.

    Plaintiff Petal Pushers & More, LLC (PP&M) is an Oregon
limited liability company whose sole shareholders are Plaintiffs

2 - OPINION AND ORDER

Deborah Westwood and Mitchell Myers.

In 2000 PP&M opened an establishment in Hermiston, Oregon, selling flowers, coffee, and sandwiches.  On November 26, 2004, PP&M applied to the Oregon Liquor Control Commission (OLCC) for a liquor license under the trade name Nookie's Bistro & Spirits. At some point after that, PP&M's establishment changed locations in Hermiston, opened up as a full-service restaurant, and changed the name of the establishment to Nookie's Bistro & Spirits.  In September 2006 a bar was added to Nookie's.

Although Westwood is the manager of Nookie's, she did not have any experience managing a bar.  When the bar first opened at Nookie's, Westwood would call the Hermiston Police Department (HPD) "anytime that anything happened, even little things" because she believed that was what she was supposed to do.  After Westwood gained more experience, she no longer called HPD for every problem.

On January 9, 2007, HPD Sergeant Timothy Beinert presented HPD Officer Scott Clark with annual goals and objectives for 2007 as part of Officer Clark's annual review.  One of the goals set for Officer Clark was to identify a Problem Oriented Policing Project (POP) and to submit the POP to his supervisor by July 27, 2007.  Officer Clark testifies in his Declaration that the purpose of the POP program "is to identify high police load areas and chronic crime locations, and assist in reducing crime in that

3 - OPINION AND ORDER

area.  We view the program as a tool to assist businesses in reducing police activity at the location, rather than as a punishment mechanism."  Decl. of Scott Clark at ¶ 5.  Officer Clark testified he selected Nookie's for his POP because he "recalled responding to a number of calls at that location" and he "reviewed police records indicating that Nookie's had received a high number of calls" between September 2006 and January 2007.  Clark Decl. at ¶ 6.

On April 9, 2007, Westwood sent a handwritten note to the City Commissioner and the HPD requesting "permission and necessary permits" to hold an outdoor event at Nookie's.  Decl. of Chief of Police Daniel Coulombe,[1] Ex. C.  Westwood was instructed to submit the appropriate OLCC form.

On April 13, 2007, Westwood submitted an Application for Temporary Use of Annual License for a "Hodrod/Harley Show" that would include a beer garden, outside barbeque, and a "tent for alcohol" on May 26, 2007.  Coulombe Decl., Ex. D.  As part of the OLCC process, HPD was notified of Westwood's Temporary-Use Application and asked to make a recommendation.

Chief Coulombe testified in his Declaration that on receipt of Westwood's Temporary-Use Application, he "recalled that

---

[1] Although Chief Coulombe's name is spelled Coloumbe in the case caption and various filings, he signs his name "Coulombe" and documents from the HPD spell his name "Coulombe."  The Court, therefore, spells Chief Coulombe's name accordingly.

Nookie's had been the subject of multiple police calls over the last few months."  Coulombe Decl. at ¶ 11.  Chief Coulombe performed a search of all police activity that had occurred at Nookie's and found several incidents within "a relatively short period of time" consistent with Chief Coulombe's recollection. Coulombe Decl. at ¶ 11.  On April 17, 2007, based on the level of police activity at Nookie's that preceded the Temporary-Use Application, Chief Coulombe recommended the OLCC deny Westwood's Temporary-Use Application and forwarded his recommendation to the OLCC together with 92 HPD Computer Aided Dispatch (CAD) reports reflecting police activity at Nookie's between April 1, 2006, through April 1, 2007.

On April 17, 2007, Chief Coulombe also sent a letter to Westwood in which he informed her that HPD recommended the OLCC deny the Temporary-Use Application because Nookie's had "been the source of an increased call load for the City of Hermiston Police Department."  Coulombe Decl., Ex. E at 1.  Specifically, Chief Coulombe noted in the 12 months prior to Westwood's Temporary-Use Application, HPD's calls to Nookie's included:

- 22 Fights and disturbances in parking lot,
- 3 medical emergencies; one seizure, one female bloody nose and unconscious, one 50 year old female passed out
- 2 criminal assaults
- 1 disorderly conduct arrest (parking lot), 1 disorderly conduct arrest in the bar
- 1 Possession of Marijuana (parking lot)
- 1 Possession of Methamphetamine (parking lot)
- 1 person thrown out, refusing to leave

- 3 Criminal mischief to vehicle, 1 criminal mischief to building
- 1 stolen vehicle report
- 1 theft of cell phone report
- 1 person arrested on 2 warrant [*sic*] out of Salem after male contacted for urinating in public (lot)
- Three under 21 year old females allowed in bar by security guard, who removed them when contacted by police
- Numerous additional calls when contact was not made or the issue left prior to our arrival. These include urinating in public, required directed patrols, pedestrian issues.

Coulombe Decl., Ex. E at 1. Chief Coulombe also advised Westwood that he had spoken to Jim Marquart of the OLCC on April 10, 2007, and requested a meeting with him and Nookie's management "to create a plan for the reduction of this increased activity." *Id*. Although the OLCC denied the Temporary-Use Application, Nookie's did not appeal the denial. Ultimately Nookie's held the event without serving alcohol outside.

Despite the fact that Chief Coulombe recommended the denial of Westwood's April 13, 2007, Application, the record reflects he recommended granting several other event applications submitted by Westwood for Nookie's and has never recommended denial of any other event application submitted to the OLCC by Nookie's.

On April 18, 2007, Chief Coulombe sent an email to HPD officers noting "Mitchell Myers, owner of Nookies Bistro has made a request that Officers not use the parking lot to enforce from, or to park in while writing police reports. He expressed concern that it hurts his business." Decl. of Leslie Edenhofer, Ex. P.

6 - OPINION AND ORDER

On April 24, 2007, Justin Burns, Plaintiffs' counsel, sent a letter to the Hermiston City Council in which he advised that Myers disputed the basis for the denial of the Temporary-Use Application, contended "certain personal allegations" made by Chief Coulombe were "false and defamatory," and gave notice (pursuant to Oregon's Tort Claims Act, Oregon Revised Statute § 30.275) that Myers intended "to assert a claim for damages against the City of Hermiston arising out of the conduct described above."  Decl. of Kari Furnanz, Ex. L at 1-2.

At some point Nookie's used Blue Mountain Security to provide security at the bar.  Although Westwood testified at her deposition that she "got rid of" Blue Mountain Security in April 2007, Larry Weaver, the owner of Blue Mountain Security, sent a "follow-up letter" to Westwood on April 24, 2007, to advise her of "the reasons [he had] for pulling [his] guards from working at Nookie's."  Coulombe Decl., Ex. F at 1.  Weaver copied the HPD and the OLCC on the letter.  Weaver advised Westwood in the letter that

> having you hire untrained, and uncertified
> bouncers to work with Blue Mountain Security
> guards creates a severe liability for us (legally,
> ethically, and for the safety of my guards).  We
> informed you of the statutes that were being
> violated when this takes place, and told you that
> our guards would not work when non-certified
> guards were working.
>
> Furthermore, we had asked for more vigilance
> to take place for your support when the time comes
> to cut someone off from drinking.  I stand behind

my guards on the issue of "86ing" customers of the
bar.  They are trained to deal with problems, but
it is a lesson in futility to be forced to let the
same trouble-makers through the doors every week
just because they are your friends.  It seemed
ridiculous to have to intervene to keep one of
your cooks from continuing to beat his wife (or
girlfriend, no one is really sure which person it
was) in your parking lot after having way too much
to drink in your bar, just for you to continue his
employment without any sort of reprimand.  The
only response you had for me is that Nookie's is
your bar and you are going to run it the way you
want to run to [*sic*].

It is for these reasons and several others
that I realize that I must terminate this business
relationship as of Sunday, April 22, 2007.
Enclosed are your last three invoices that remain
unpaid.

Coulombe Decl., Ex. F at 1-2.

On June 7, 2007, Sergeant Beinert sent a letter to Stan
Fetterhof of the OLCC in which he advised Fetterhof that Deanne
Jensen, an employee of Nookie's, had been arrested in the prior
six months for Driving Under the Influence of Intoxicants and
Possession of Methamphetamine while coming from or going to work
at Nookie's.  Decl. of Brian C. Dretke, Ex. O.  Sergeant Beinert
advised Fetterhof that the HPD had already forwarded the police
reports to the Umatilla District Attorney's Office and was
sending the reports to Fetterhof "for informational purposes
only."  Dretke Decl., Ex. O.

On June 29, 2007, the OLCC implemented a Control Plan for
Nookie's that required Nookie's to comply with the following:

8 - OPINION AND ORDER

The licensee or a manager will be present at the
license premises Friday and Saturday during busy
hours.

The licensees will provide security personal that
have been certified by the Department of Public
Safety & Standard and Training.

The licensees will provide alcohol monitors who
will wear shirts with lettering similar to
"ID/Alcohol Monitor."

Only identification recognized by Oregon Law is
acceptable as proof of age.

An incident log book will be used by Nookie's
staff to record any incident or issue which
occurs.  An additional incident log book will be
used to record the times that the parking lot and
perimeter are checked.  The licensee will have an
86'd list at each entrance of the premises.

The licensees will post signs that say "**no
fighting, Disorderly or Unlawful activity will be
Tolerated-Violators will be 86'd for a year and/or
prosecuted."**

The following conditions will be in effect on
Friday and Saturday from 5pm to 2am:

* Food will be available at all times
* Patrons drinking shots will be monitored
  to prevent over consuming
* Limit of One [*sic*] multi alcohol drinks
  [*sic*] per person per night
* No drink stacking
* All alcoholic beverages will be served
  in plastic cups
* ID/Alcohol monitors will be posted at
  each entry door
* Certified licensed security will be at
  the premises to monitor the interior and
  exterior/parking lot area
* No last call

Edenhofer Decl., Ex. G at 25 (emphasis in original).  Also on

June 29, 2007, the OLCC implemented a Special Events Control Plan

9 - OPINION AND ORDER

for Nookie's that contained the following three requirements in
addition to the requirements of the Control Plan:

> * 2 Porta-potties will be available outside to
>   prevent indecent behavior, liens &
>   frustration
> * Upon entry patrons will be issued a colored,
>   tamper resistant wrist band
> * Alcoholic beverages will remain in the
>   outdoor area.

Edenhofer Decl., Ex. G at 23.  Westwood testified at deposition

that "the only thing that really changed [at Nookie's after

implementing the Control Plan was that Nookie's served] alcohol

in plastic [cups] in the beginning after nine o'clock."  Furnanz

Decl., Ex. A at 5, 6.

On July 22, 2007, at 4:22 a.m., HPD Officer Darryl Johnson

sent an email to the HPD "PDTEAM" in which he described a call

from Nookie's that HPD responded to at 12:46 a.m. that day.

Officer Johnson described the events as follows:

> On 072207 at or about 0046 hrs. HPD and UCSO
> dispatch received several 911 calls reference
> [*sic*] a large fight that was out of control inside
> Nookies where the owner was involved and being
> pushed around.  Upon arriving Officer Goiter
> approached the south door to enter and was met by
> the owner, Debbie [Westwood] who refused to allow
> him inside advising nothing was going on.  Officer
> Goiter attempted to speak with the security
> personnel, but was cut off by [Westwood] who
> pulled the security officer to the side, grabbed
> him by the face and told him to tell Officer
> Goiter nothing was going on, which he did.  As no
> fight was seen or heard at this time officers
> cleared with no action at this time.
>
> At or about 0154 hrs we again received another
> call of a large fight with 40 subjects involved

which was also UTL [unable to locate].  From what
I have been told Nookies is to be closed at 0130
hrs, but there was still a very large crowd that
had not left the scene.  Officer Goiter spoke to a
subject who advised that there was not a fight,
but [there] was going to be a fight connected to
the previous call and thats [*sic*] why everyone was
still there.

Owner [Westwood] kept telling us to get off of her
lot and she was advised by me that given the calls
and information that was received we would be
staying until the lot Cleared [*sic*].  [Westwood]
made threats about speaking to her attorney and
other city officials.  I advised [Westwood] she
was free to do so, but we were staying until the
lot cleared and we were sure no further situations
would arise.  [Westwood] accused me of being rude.
[Westwood] was visibly intoxicated as was a
majority of the crowd.  Officer Goiter had to cite
one subject who urinated on the south patio area
who was highly intoxicated and had obviously been
over served.  Security officers at the scene were
as usual no help with any of the crowd Issue, or
information about the fights, or possible fights.

Dretke Decl., Ex. R at 12.

On July 22, 2007, Officer Bill Golter prepared a report on

the July 22, 2007, calls about Nookie's.  Officer Golter

summarized the events as follows:

On 07/21/07 [*sic*] at approximately 0047 hours, I
was dispatched to Nookie's Bistro & Spirits, 125 N
1st ST for a report of a fight in progress inside
the bar.  Dispatch advised there was a large fight
in the bar and that the owner was in the middle of
it and being pushed around.  Sergeant Johnson,
Officer Vega and I all responded.

At approximately 0048 hours I arrived on scene.  I
entered the south parking lot off of W Locust AVE.
As I entered the lot, I saw numerous people
standing around outside and in front of the doors
into the bar.  I approached the bar and advised
several people to step back and give me room.

11 - OPINION AND ORDER

When I reached the front door, the owner, Deborah
[Westwood], met me and advised that I was not
needed.  As I continued towards the door,
[Westwood] stepped in front of me and placed her
hands up to block me from entering the bar.  She
said over and over that there was nothing
happening and I needed to leave.  [Westwood]
continued to stand in front of me, blocking my
entry into the bar.  At this time I didn't feel
safe forcing my way into the bar.  I could see a
good portion of the bar form the front door and
there was no fighting at that time.

I advised [Westwood] of the call we had received
and told her I would like to check for myself to
verify that everything was ok.  While talking with
[Westwood], I noticed several people standing
around her agreeing with her statements that
nothing had happened.  [Westwood] again said that
I wasn't needed.  She said she didn't know who had
called 911 or why but said it wasn't needed.

The security guard, Christopher Stone, who was
standing with Myers, said that two males got into
a verbal argument and were both removed form the
bar.  While he was talking, [Westwood] kept
telling him to be quiet and say nothing.  I asked
Stone to step over to my patrol vehicle with me,
so I could take his statement.  [Westwood]
immediately became angry and told me nothing
happened.  She then turned to Stone and told him
"tell him nothing happened, don't tell him
anything."  I again told Stone to come to my car
and I started towards my patrol vehicle.  As soon
as I was out of ear shot, [Westwood] grabbed Stone
by the face and started talking to him.
[Westwood] then let Stone go and he came to where
I was.

Stone said two unidentified males were in an
argument and had both been removed.  Stone said
that was all that had happened.  I was unable to
get any further information from Stone regarding
this incident.

Dretke Decl., Ex. R at 4.  Officer Golter noted under ACTION

RECOMMENDED/CASE STATUS:  "Forward a copy of this report to the

12 - OPINION AND ORDER

OLCC for review."  Dretke Decl., Ex. R at 4.

On July 23, 2007, Chief Coulombe advised Officer Johnson by email that he needed Officer Johnson's account of the events "ASAP" to supplement Officer Golter's police report.  Dretke Decl., Ex. S at 1.  Accordingly, on July 23, 2007, Officer Johnson filed a Supplement to Officer Golter's Incident Report in which Officer Johnson repeated nearly verbatim the information set out in his July 22, 2007, email to the HPD "PDTEAM" with the following additional statement:  "After the lot cleared I monitored the lot and saw that the usual after closing party was still going at 0500 hrs."  Dretke Decl., Ex. R at 5.

On July 26, 2007, Officer Johnson cited Westwood for Obstructing Governmental or Judicial Administration in violation of Oregon Revised Statute § 162.235 based on Westwood's actions on July 22, 2007.  Also on July 26, 2007, Chief Coulombe faxed the reports of the July 22, 2007, events to Umatilla County District Attorney Dean Gushwa and noted:  "Reports support the charge of 162.235 Obstructing Governmental or Judicial Administration A-MISD."  Dretke Decl., Ex. T at 1.

On August 1 and 4, 2007, HPD Officer Leonard Stokoe supplemented the police reports related to the July 22, 2007, incident and stated Deputy District Attorney Daniel Wendel had asked the HPD to conduct interviews of individuals possibly involved in the July 22, 2007, incident.  Officer Stokoe reported

13 - OPINION AND ORDER

he spoke with two women involved in the incident who stated:
"[I]t was a big fight . . . a bunch of people were involved," and
it began in the bar and resulted in at least one of the women
being "86'd" from Nookie's.  Dretke Decl., Ex. R at 7-9.  Officer
Stokoe forwarded copies of his supplemental reports to the
Umatilla District Attorney's Office.

On September 18, 2007, Burns sent another letter to the
Hermiston City Council "constitut[ing] notice of a claim pursuant
to ORS 30.275" because Myers and Nookie's intended to "assert a
claim for damages against the City of Hermiston for claims
arising out of a concerted and ongoing pattern of conduct
undertaken by the City of Hermiston Police Department to harass,
intimidate, and persecute Mr. Meyers, Nookies, and Nookies
employees."  Furnanz Decl., Ex. M at 1.

On September 19, 2007, Umatilla Deputy District Attorney
Mark Kemp issued an Information of Misdemeanor against Westwood
charging her with Obstructing Governmental or Judicial
Administration in violation of Oregon Revised Statute § 162.235.

At some point the OLCC received approximately 25 photographs
of Nookie's employees taken at the end of 2007 that showed them
engaging in activities such as posing with customers while
holding alcoholic beverages and exposing their breasts and
buttocks before closing time.  Although the photos were sent
anonymously, Myers testified at deposition that he believes they

were submitted to the OLCC by Amanda Morris, one of Nookie's employees.

On March 17, 2008, Burns sent a third claims letter to the Hermiston City Council, which constituted notice of claim pursuant to Oregon Revised Statute § 30.275 on behalf of Myers, Nookie's, and Westwood "for lost profits and other damages arising out of the conduct described in [the] prior tort claim notices."  Furnanz Decl., Ex. N at 1.

On August 15, 2008, a jury found Westwood not guilty of the charge of Obstructing Governmental or Judicial Administration. On August 27, 2008, the Umatilla County Circuit Court entered a judgment of acquittal.

The OLCC never suspended, terminated, or took any adverse action as to Nookie's liquor license nor has the OLCC ever fined Nookie's.

Between March 9, 2005, and April 2, 2010, the OLCC has identified 25 violations by liquor licensees in Hermiston other than Nookie's.

## PROCEDURAL BACKGROUND

On April 16, 2009, Westwood, Myers, and PP&M filed an action in Umatilla County Circuit Court against the City of Hermiston, Chief Coulombe, and HPD Officer Chris Washburn.  Plaintiffs alleged state-law claims against the City of Hermiston for

15 - OPINION AND ORDER

(1) intentional interference with a business relationship and

(2) malicious prosecution.  Plaintiffs also alleged federal

claims under 42 U.S.C. § 1983 against all Defendants for

(1) violation of Plaintiffs' rights to procedural due process and

(2) violation of their rights to equal protection.  Finally,

Westwood alleged claims under § 1983 against all Defendants for

(1) violation of her right to procedural due process related to

her liberty interest in her reputation and (2) malicious

prosecution.

On April 29, 2009, Defendants removed the matter to this

Court on the basis of federal-question jurisdiction.

On September 20, 2010, the Court entered an Order pursuant

to a stipulation by the parties dismissing with prejudice all

claims against Officer Washburn.

On September 22, 2010, the remaining Defendants (City of

Hermiston and Chief Coulombe) filed a Motion for Summary Judgment

as to all of Plaintiffs' claims.

On January 3, 2011, the Court entered an Order directing

Plaintiffs to provide to Defendants and the Court a written

statement describing the nature and extent of all monetary

damages that Plaintiffs seek to recover in this action.  On

January 6, 2010, Plaintiffs filed a Statement of Damages.

After reviewing the parties' submissions, the Court sent the

parties its initial analysis of the issues raised in Defendants'

Motion and Plaintiffs' arguments in opposition.  Although the
Court noted its preliminary conclusion was to grant Defendants'
Motion, the Court emphasized at the oral argument on February 7,
2011, that it intended to fully reconsider that preliminary
conclusion in light of the arguments to be presented.  At the
hearing, counsel for Plaintiffs in particular emphasized various
parts of the evidentiary record and their written arguments in
support of their conclusion that Defendants were not entitled to
summary judgment on any basis.  The Court took Defendants' Motion
under advisement at the conclusion of the hearing.

### STANDARDS

Federal Rule of Civil Procedure 56(c) authorizes summary
judgment if no genuine issue exists regarding any material fact
and the moving party is entitled to judgment as a matter of law.
The moving party must show the absence of an issue of material
fact.  *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th
Cir. 2005).  In response to a properly supported motion for
summary judgment, the nonmoving party must go beyond the
pleadings and show there is a genuine issue of material fact for
trial.  *Id.*

An issue of fact is genuine "'if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party.'"
*Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th

17 - OPINION AND ORDER

Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The court must draw all reasonable inferences in favor of the nonmoving party.  *Id.*  "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues." *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004)(citing *Sherman Oaks Med. Arts Ctr., Ltd. v. Carpenters Local Union No. 1936,* 680 F.2d 594, 598 (9th Cir. 1982)).

When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary." *Wong v. Regents of Univ. of Cal.*, 379 F.3d 1097 (9th Cir. 2004), *as amended by* 410 F.3d 1052, 1055 (9th Cir. 2005) (citing *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1149 (9th Cir. 1998)).

The substantive law governing a claim or a defense determines whether a fact is material. *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment.  *Id.*

## **DISCUSSION**

### **I.  Plaintiffs' claim against City of Hermiston for intentional interference with business relationship(s).**

Plaintiffs contend Defendant City of Hermiston intentionally

interfered with Nookie's business relationship with the OLCC
and/or its relationship with its customers when (1) Chief
Coulombe and other HPD officers sent police reports to the OLCC
documenting police activities at Nookie's and continued to report
to the OLCC about police activities at Nookie's and/or (2) the
HPD's police presence at Nookie's was such that customers were
"reluctan[t] to go to Nookie's."

Defendants move for summary judgment as to Plaintiffs' claim
on the grounds that (1) statements made to the OLCC by public
officials are absolutely privileged, (2) PP&M did not have a
business relationship with the OLCC within the meaning of the
tort of intentional interference, and (3) Plaintiffs have failed
to sufficiently establish the elements of its claim to withstand
summary judgment.

**A.    Real party in interest**

In their Complaint, Plaintiffs allege they "have an
economic relationship with their customers . . . [and] a business
relationship with the OLCC." Compl. at ¶ 7. As noted, however,
Nookie's is owned by PP&M, which in turn is owned by Myers and
Westwood. Accordingly, for purposes of analyzing a relationship
with customers or the OLCC, PP&M is the only real party in
interest as to this claim. *See, e.g., Lee v. Mitchell*, 152 Or.
App. 159, 173 (1998)("a stockholder has no personal right of
action against a third party for a wrong to the corporation.").

19 - OPINION AND ORDER

Accordingly, to the extent Westwood and Myers bring a claim for intentional interference with business relations with the OLCC or with Nookie's customers, the Court grants Defendants' Motion for Summary Judgment.

## B.    Standards

Under Oregon law the elements of a claim for intentional interference with a business relationship are:

> (1) the existence of a professional or business relationship (which could include, *e.g.*, a contract or a prospective economic advantage); (2) intentional interference with that relationship or advantage; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and the harm to the relationship or prospective advantage; and (6) damages.

*Allen v. Hall*, 328 Or. 276, 281 (1999).  *See also Wieber v. FedEx Ground Package Sys., Inc.*, 231 Or. App. 469, 477 (2009)(same).

## C.    PP&M's claim against City of Hermiston for intentional interference with its relationship with the OLCC.

### 1.    Under Oregon law PP&M does not have a business relationship with OLCC within the meaning of the tort of intentional interference.

Defendants assert PP&M cannot establish it has the kind of business relationship with the OLCC that falls within the parameters of the tort of intentional interference with a business relationship.  As the Oregon Court of Appeals explained:

> Under Oregon law, a party may recover damages for wrongful interference with a contract.  *Wampler v. Palmerton*, 250 Or. 65, 439 P.2d 601 (1968).  The interest protected by the tort is "the interest of

> the individual in the security and integrity of
> the contractual relations into which he has
> entered.  Economic relations are controlled by
> contract and the public also has an interest in
> maintaining the security of such transactions."
> *Wampler*, 250 Or. at 73, 439 P.2d 601.  Moreover,
> in appropriate circumstances, a third party's
> interference may be actionable "even though the
> arrangement interfered with does not rise to the
> dignity of a contract."  *Luisi v. Bank of
> Commerce*, 252 Or. 271, 275, 449 P.2d 441 (1969);
> *see, e.g., Aylett v. Universal Frozen Foods Co.*,
> 124 Or. App. 146, 861 P.2d 375 (1993)(potato
> growers could bring action for intentional
> interference with their relationship with a
> prospective buyer).  *See also McGanty v.
> Staudenraus*, 321 Or. 532, 535, 901 P.2d 841 (1995)
> (describing the tort of intentional interference
> with economic relations as protecting a
> "prospective economic advantage").

*Fox v. Country Mut. Ins. Co.*, 169 Or. App. 54, 73 (2000).

PP&M conceded at oral argument that it did not

know of any case that has recognized the tort of intentional

interference when the relationship allegedly interfered with was

between a private entity and a governmental agency.  Nonetheless,

PP&M asserts under *Allen* that such a relationship may form the

basis for a claim of intentional interference.

Although the *Allen* court held the tort included

noncommercial relationships in limited circumstances, in the

context of an alleged interference with a civil lawsuit the court

in *Fox* concluded the tort did not apply because even though

> courts have expanded the tort to protect
> additional types of relationships, its purpose has
> been constant:  To protect the integrity of
> voluntary economic relationships, both commercial
> and noncommercial, that would have very likely

21 - OPINION AND ORDER

> resulted in a pecuniary benefit to the plaintiff
> but for the defendant's interference.
>
>                       * * *
>
> Protection of a prospective interest in the
> outcome of civil litigation does not comport with
> that essential purpose.  A lawsuit is, by its
> nature, an involuntary relationship.

*Id.* at 75.

The Court concludes similar reasoning applies here.  PP&M's relationship with the OLCC is not a "voluntary economic relationship" but arises from the statutory requirement that sellers of alcoholic beverages must obtain a license from the OLCC.  *See generally* Oregon Revised Statute Title 37.  The Court, therefore, concludes PP&M's relationship with the OLCC is not the kind of relationship that the tort of intentional interference with a business relationship was intended to protect.

**2.   PP&M has not established the City of Hermiston
       interfered with its OLCC license.**

Even if PP&M's relationship with the OLCC was protected by this tort, the record reflects PP&M's liquor license remains in effect and the OLCC has never revoked, suspended, or taken any other action against PP&M's liquor license as a result of Defendants' reporting or enforcement actions.  Although counsel asserted at oral argument that the OLCC Control Plans for Nookie's is evidence of interference with PP&M's liquor license, the Court notes Westwood conceded at deposition that the plans

22 - OPINION AND ORDER

did not require any significant change in Nookie's existing practices.  On this record, the Court does not find any basis in law to conclude the Control Plans constituted an interference sufficient to establish this tort.  Thus, because PP&M has not shown any actual interference with its OLCC license as a result of Defendants' conduct, PP&M has not provided an evidentiary record from which rational jurors could find the requisite interference with the relationship between PP&M and the OLCC.

Accordingly, the Court grants Defendants' Motion for Summary Judgment as to PP&M's claim against the City of Hermiston for intentional interference with its business relationship with the OLCC.

**D.    PP&M's claim against the City of Hermiston for intentional interference with its relationship with its customers.**

PP&M alleges in the Complaint that the City of Hermiston intentionally interfered with PP&M's business relationship with its customers as follows:  "Defendant's interference . . . caused the selective police activity in the vicinity of Nookie's for the purpose of . . . keeping customers away."  Compl. ¶ 10.  In the Response to Defendants' Motion for Summary Judgment, PP&M alleges the HPD as part of the POP

> stepped up patrols through the parking areas around the business and conducted numerous walk-throughs of the interior of the bar while noting that Nookie's owners felt it was bad for business. In particular, the HPD pursued "zero-tolerance for law violators in and around the property, i.e.:

23 - OPINION AND ORDER

disturbances, urinating in public, jaywalking,
etc.  Under the POP, patrol divisions were to be
notified of the project and asked to implement a
zero-tolerance approach when dealing with
violators.

Pls.' Resp. at 5.

Defendants seek summary judgment on the grounds that
(1) PP&M fails to establish causation and (2) PP&M has not
established the City of Hermiston acted with any improper means
or improper purpose.

"'The fifth element [of the tort of intentional
interference] requires a causal nexus between the *interference*
and the *damage* to the relationship.'"  *MLM Prop.*, 2010 WL 678149,
at *7 (quoting *Douglas Med. Ctr.,* 203 Or. App. at 635)(emphasis
in original).  According to Defendants, PP&M has not established
any actions by Defendants caused actual economic damage to
Nookie's.  PP&M, however, contends Defendants' "conduct . . .
discouraged customers' access to Nookies or patronage of
Nookies."

As noted, PP&M is the sole owner of Nookie's, and,
therefore, Westwood and Myers are not real parties in interest to
Nookie's claim of intentional interference with its relationships
with its customers.  Nonetheless, Plaintiffs submitted a
Statement of Damages in which they assert (1) Westwood suffered
damages in the form of legal fees and costs incurred in defending
the charge of Obstructing Governmental or Judicial Adminis-

24 - OPINION AND ORDER

tration; (2) Myers suffered damages in the form of legal fees "in responding to the allegations against him in Coulombe's letter dated April 17, 2007"; and (3) PP&M "incurred attorney fees and costs in defending Nookie's liquor license and defending against alleged violations of liquor laws and regulations."  Because only PP&M is the real part in interest to Nookie's claim of intentional interference with Nookie's relationship with its customers, however, the fact that Westwood and Myers may have suffered economic losses does not establish PP&M suffered legal damages and, therefore, does not form a basis for any causal nexus for PP&M's claim of intentional interference with its relationship with its customers.

In addition, PP&M does not show how the damages allegedly suffered by Nookie's (attorneys' fees and costs in defending its liquor license and alleged violations of liquor laws) are causally related to any alleged interference with Nookie's relationship with its customers.  In particular, PP&M does not allege or identify any evidence in the record that shows it suffered lost profits or a reduction in income resulting from Defendants' alleged interference with Nookie's customers or any other damages causally related to the alleged interference with Nookie's customers.

On this record the Court concludes PP&M has not offered evidence to satisfy the causation element required to establish a

claim for intentional interference with the relationship between PP&M and the customers of Nookie's. In turn, the Court need not address Defendants' argument regarding improper means or motive.

In summary, after viewing the record in the light most favorable to Plaintiffs, the Court concludes Plaintiffs have not established (1) PP&M may bring a claim for intentional interference with its relationship with the OLCC, (2) the City of Hermiston interfered with PP&M's OLCC license, and (3) the alleged interference was causally related to any damages suffered by PP&M. Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Plaintiffs' claim for intentional interference with business relations.

## II. Westwood's state-law claim against the City of Hermiston for malicious prosecution.

Westwood brings a state-law claim for malicious prosecution against the City of Hermiston on the ground that she was "cited and prosecuted for violation of ORS 162.235." Westwood contends the City "instituted and continued the prosecution for [the] primary purpose . . . to effect the liquor license of Nookie's and to cause Nookie's harm." Compl. at ¶ 17.

Defendants seek summary judgment on the grounds that (1) Westwood did not submit a timely Tort-Claim Notice as to this tort, (2) the City of Hermiston did not initiate or prosecute the criminal charges against her, (3) there was probable cause to prosecute Westwood, and (4) Westwood cannot establish malice.

26 - OPINION AND ORDER

**A.    Tort-Claim Notice**.

Defendants contend Westwood's state-law malicious-prosecution claim against the City of Hermiston is time-barred because Westwood did not submit a timely Tort-Claim Notice as to this claim.   Oregon Revised Statute § 30.275 provides in pertinent part:

> (1)  No action arising from any act or omission of a public body or an officer, employee or agent of a public body . . . shall be maintained unless notice of claim is given as required by this section.
>
> (2)  Notice of claim shall be given within the following applicable period of time. . .:
>
>                          * * *
>
>      (b) . . . within 180 days after the alleged loss or injury.

Westwood did not provide a Tort-Claim Notice to the City of Hermiston related to her claim for malicious prosecution until March 17, 2008.  Defendants, therefore, contend Westwood's malicious-prosecution claim is untimely because her claim accrued before September 19, 2007, which is 180 days before March 17, 2008.  Oregon courts, however, have held claims for malicious prosecution under Oregon law do not accrue until "the criminal proceedings terminate in plaintiff's favor."  *Edwards v. State ex rel. Dep't of Human Res. Children and Adult Families Div.,* 217 Or. App. 188, 198 n.2 (2007).  Westwood's state-law claim for malicious prosecution, therefore, did not accrue until she was

found not guilty on August 15, 2008, which is after September 19, 2007, the date on which this part of Defendants' Motion focuses.

Accordingly, the Court concludes Westwood's state-law claim for malicious prosecution against the City of Hermiston is not untimely for the reasons Defendants argue.

**B.    Elements of a state-law malicious-prosecution claim.**

To establish malicious prosecution under Oregon law, a plaintiff must prove (1) the defendant initiated or prosecuted a judicial proceeding against the plaintiff, (2) the proceeding terminated in the plaintiff's favor, (3) the defendant lacked probable cause to prosecute the action, (4) the defendant acted with malice or with the "primary purpose other than that of securing an adjudication of the claim by the defendant," and (5) the plaintiff suffered damages. *Perry v. Rein,* 215 Or. App. 113, 125 (2007).

**C.    Initiation and prosecution of the judicial proceedings against Westwood.**

Defendants contend the City is entitled to summary judgment on Westwood's state-law malicious prosecution claim because Umatilla County Deputy District Attorney Mark Kemp made the decision to initiate and to prosecute the charge against Westwood rather than the City of Hermiston.  Westwood, however, asserts "the fact that the City police officers took an active part in the unfounded criminal proceeding is sufficient for this tort."  Westwood relies on *Rogers v. Hill*, 281 Or. 491 (1978),

28 - OPINION AND ORDER

and *Checkley v. Boyd*, 170 Or. App. 721 (2000), to support her
assertion.

In *Rogers* the plaintiff intervened in an argument
between Multnomah County Deputy Sheriff Hill and a third party.
The plaintiff was arrested, prosecuted, and ultimately acquitted
of resisting arrest.  The plaintiff then brought an action
against Deputy Hill for, among other things, malicious
prosecution.  A jury returned a verdict for the plaintiff on his
claim for malicious prosecution, and Deputy Hill appealed
alleging, among other things, that the trial court erred when it
denied his request for a directed verdict as to the plaintiff's
malicious-prosecution claim because the Deputy District Attorney
initiated the prosecution rather than Deputy Hill.  281 Or. at
493, 498.  The Oregon Supreme Court held the trial court did not
err:

> A law enforcement officer's role in initiating a
> prosecution is not identical to that of a private
> complainant, nor is the measure of his liability
> the same.  Here we must distinguish between the
> issue of the "initiation" of a prosecution, which
> is essentially a question of the causal linkage
> between the defendant's acts and the start of the
> criminal process, and the different issue of a
> police officer's privilege for official acts which
> is not enjoyed by a private defendant.  The extent
> of this privilege is unsettled, and since
> defendant does not invoke such a privilege, we
> express no view whether it would be available to
> him here.  But on the issue of "initiation" there
> can be no doubt that defendant set the criminal
> law in motion against plaintiff here.

*Id*. at 499.

29 - OPINION AND ORDER

In *Checkley* the plaintiff brought a claim for wrongful initiation of civil proceedings[2] against the defendants on the ground that the plaintiff's disabled brother brought guardianship proceedings against the plaintiff only at the encouragement and with the assistance of the defendants.  The trial court dismissed the plaintiff's claim for wrongful initiation of civil proceedings on the ground that the plaintiff did not plead the defendants initiated or prosecuted the allegedly wrongful civil proceeding against him.  170 Or. App. at 734-35.  The Oregon Court of Appeals held the trial court erred:

> The Restatement takes the position that "[o]ne who takes an *active part* in the initiation, continuation or procurement of civil proceedings against another" may be liable. (Emphasis added.) Although the issue is one of first impression in Oregon, it is not one on which we lack significant guidance.  The Oregon Supreme Court has adopted the "active participant" rule with respect to the related tort of malicious prosecution. *Rogers v. Hill*, 281 Or. 491, 499-500, 576 P.2d 328 (1978) (officer who filed reports on which prosecution based was potentially liable as "active participant").  In doing so, the court recognized that the requirement that the defendant be the party who initiates the underlying criminal proceeding is merely a way to describe the causation element of the tort.  *Id*. at 499, 576 P.2d 328.  *See also Waldner v. Dow*, 128 Or. App. 197, 200-01, 876 P.2d 785 (1994).  In other words, that element concerns the person who serves as the impetus of the prosecution, and therefore it is

---

[2] "An action for wrongful initiation of civil proceedings is the civil analog to a malicious prosecution action. *Erlandson v. Pullen*, 45 Or. App. 467, 470, 608 P.2d 1169 (1980).  The torts are so similar that the legal analysis often is used inter-changeably." *Checkley*, 170 Or. App. at 735-36.

not limited to the party that formally brings the
action.

*Id.* at 735-36 (emphasis in original).

Here the record reflects Chief Coulombe faxed the
police reports related to Westwood's interactions with the HPD on
July 22, 2007, to Deputy District Attorney Kent and included on
the cover sheet the statement that "[r]eports support the charge
of 162.235 Obstructing Governmental or Judicial Administration A-
MISD." Pursuant to *Rogers* and *Checkley*, the Court concludes
Chief Coulombe's report to the Deputy District Attorney is
sufficient under Oregon law to establish that the City of
Hermiston initiated the criminal proceeding against Westwood.

**D.   Probable cause to prosecute Westwood.**

Defendants also assert they are entitled to summary
judgment on this claim because Westwood cannot establish she was
prosecuted without probable cause. As noted, a required element
of Westwood's state-law malicious prosecution claim against
Defendant City of Hermiston is that Defendant lacked probable
cause to prosecute Westwood for allegedly obstructing Hermiston
police officers who attempted to investigate the July 22, 2007,
incident. Oregon Revised Statute § 162.235 provides in pertinent
part: "A person commits the crime of obstructing governmental or
judicial administration if the person intentionally obstructs,
impairs or hinders the administration of law or other
governmental or judicial function by means of intimidation,

31 - OPINION AND ORDER

force, physical or economic interference or obstacle."

"In the context of a malicious prosecution claim, 'probable cause' refers to the subjective and objectively reasonable belief that the defendant committed a crime." *Blandino v. Fischel*, 179 Or. App. 185, 191 (2002)(citing *Gustafson v. Payless Drug Stores N.W., Inc.*, 269 Or. 354, 358 (1974)).

Thus, for Westwood to prevail on her malicious-prosecution claim, she must, among other elements, establish the City of Hermiston lacked both the subjectively and objectively reasonable belief that Westwood intentionally obstructed, impaired, or hindered the administration of law or other governmental or judicial function by means of intimidation, force, or physical or economic interference or obstacle. As the Oregon Supreme Court has held:

> One who initiates criminal proceedings against another has probable cause for so doing if he . . . reasonably believes that the person accused has acted or failed to act in a particular manner, and . . . correctly believes that such acts or omissions constitute at common law or under an existing statute the offense charged against the accused.

*Gustafson v. Payless Drug Stores N.W., Inc.*, 269 Or. 354, 356-57 (1974)(quotations omitted). In addition, the Court concluded:

> Whether the defendant had probable cause to institute the criminal proceeding is a matter for the court to decide and not the jury. Prosser commented: "* * * (T)he existence of probable cause, which involves only the conduct of a

> reasonable man under the circumstances, and does
> not differ essentially from the determination of
> negligence, usually is taken out of the hands of
> the jury, and held to be a matter for decision by
> the court. * * *." Prosser, Torts (3d ed.),
> 846-847, s 119.  We uniformly have adhered to this
> principle.  For examples, *Varner v. Hoffer, supra*,
> 267 Or. 175, 515 P.2d 920; *Kuhnhausen v.
> Stadelman*, 174 Or. 290, 310, 148 P.2d 239, 149
> P.2d 168 (1944).
>
> "If the facts or inferences are in dispute the
> jury must decide the facts and the court must
> instruct the jury what facts constitute probable
> cause." *Varner v. Hoffer, supra*, 267 Or. at 179,
> 515 P.2d at 921.

*Id*. at 358.  *See also Pereira v. Thompson*, 230 Or. App. 640, 676

(2009)("Whether a defendant had probable cause to initiate a

proceeding is a question of law for the court if the facts or

inferences are undisputed; if the facts are disputed, then a jury

must decide the facts and the court must instruct the jury what

facts constitute probable cause.").

At oral argument Plaintiffs' counsel emphasized

Westwood's contention that probable cause was lacking as to two

elements of the crime charged against her:  (1) there was not

probable cause to believe Westwood "physically" obstructed

Officer Goiter from carrying out his duties and (2) there was not

probable cause to believe Westwood acted "intentionally" in any

such physical obstruction.

As to the "physical interference or obstacle" element,

the Court notes the Oregon Supreme Court held as follows in *State

v. Gaines*:

> [F]or a defendant to obstruct a governmental
> function by means of a "physical interference or
> obstacle" requires some conduct or act on a
> defendant's part that results in a bodily or
> material obstruction to a governmental activity or
> process.

346 Or. 160, 176 (2009).

Here undisputed CAD reports produced by the parties reflect calls were made to the HPD on July 22, 2007, reporting a fight was in progress in the bar at Nookie's before the HPD officers arrived. In addition, Westwood testified at her deposition that when the HPD officers arrived at Nookie's on July 22, 2007, she was standing in the doorway with Security Guard Chris Stone and an HPD officer stood in front of her outside of the bar. Furnanz Decl., Ex. A at 14. Westwood admitted she told the officer more than once that he "was not needed," and she "lift[ed] up [her] hands and [she] talk[ed] with [her] hands" when she spoke. Furnanz Decl., Ex. A at 14. Westwood testified, "I don't know if [the officer] took that as me pushing him or whatever. . . . I talk with my hands as I was talking to him." Furnanz Decl., Ex. A at 14.

Viewing the evidence in the light most favorable to Westwood, including her version of events at deposition and the record of calls reporting a fight inside the bar, the Court concludes as a matter of law that there was both a subjective and objective basis for HPD officers to believe Westwood was intentionally physically obstructing an investigation of the

34 - OPINION AND ORDER

July 22, 2007, report of a fight at Nookie's when Westwood stood in the doorway effectively blocking Officer Golter's entry and repeatedly talking "with her hands" and telling him he "was not needed." Thus, the Court concludes Westwood has not established the HPD lacked probable cause to cite her for Obstructing Governmental or Judicial Administration and to report that citation to the District Attorney's Office.

Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Westwood's state-law claim for malicious prosecution. Because the Court concludes Westwood has not established Defendants lacked probable cause to cite her for Obstructing Governmental or Judicial Administration and to report that citation to the District Attorney's Office, the Court does not address Defendants' assertion that Westwood has not established malice.

### III. Plaintiffs' § 1983 claim for deprivation of property without procedural due process.

Plaintiffs allege they had a property interest "in their continued status as licensees of the OLCC" created under Oregon law and through "the regulations of the OLCC relating to the award of, renewal of and revocation or suspension of liquor licenses." In their Response to Defendants' Motion for Summary Judgment, Plaintiffs also allege they had a property interest in the goodwill of their business. Plaintiffs allege Defendants violated Plaintiffs' rights to procedural due process affecting

35 - OPINION AND ORDER

these property interests when Defendants (1) "filed false reports with the OLCC in an attempt to convince the OLCC to take negative action with regard to the liquor license of Nookie's" and (2) "arrested or cited customers, employees, or owners of Nookie's not with the purpose of bringing them to justice but with the purpose of convincing the OLCC to take negative action with regard to the liquor license of Nookie's."

> The Fourteenth Amendment protects individuals against the deprivation of liberty or property by the government without due process. A Section 1983 claim based upon procedural due process thus has three elements: (1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; (3) lack of process. The Due Process Clause does not create substantive rights in property; the property rights are defined by reference to state law.

*Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). A deprivation that is an "indirect and incidental result of [a] Government's enforcement action[] does not amount to a deprivation of any interest in life, liberty, or property." *O'Bannon v. Town Ct. Nursing Ctr.*, 447 U.S. 773, 787 (1980).

**A.    Real party in interest.**

As noted, PP&M is the owner of Nookie's, and, therefore, Nookie's rather than Westwood or Myers owns Nookie's liquor license and Nookie's alleged goodwill. Accordingly, to the extent that Westwood and Myers bring a claim for violation of their rights to due process with respect to Nookie's liquor

36 – OPINION AND ORDER

license and/or Nookie's goodwill, the Court grants Defendants'
Motion for Summary Judgment as to those claims.

### B. PP&M has a property interest in Nookie's liquor license.

PP&M contends it has a property interest in Nookie's
liquor license because "ORS Chapter 471 contains provisions
regarding the cancellation or suspension of a license, or
imposition of a civil penalty, which requires the OLCC have
reasonable grounds before taking any negative action."

Although federal law controls the process that is due,
property interests themselves "'are created and their dimensions
are defined by existing rules or understandings that stem from an
independent source such as state law-rules or understandings that
secure certain benefits and that support claims of entitlement to
those benefits.'" *Newman v. Sathyavaglswaran*, 287 F.3d 786, 790
(9th Cir. 2002)(quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577
(1972)).

"To have a property interest in a benefit, a person
clearly must have more than an abstract need or desire for it.
He must have more than a unilateral expectation of it.  He must,
instead, have a legitimate claim of entitlement to it." *Bd. of
Regents v. Roth*, 408 U.S. 564, 577 (1972).  In addition, the
United States Supreme Court has "recognize[d] that a benefit is
not a protected entitlement if government officials may grant or
deny it in their discretion." *Town of Castle Rock v. Gonzales*,

37 - OPINION AND ORDER

545 U.S. 748, 756 (2005)(citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 462-63 (1989)).

As to whether an individual has a protectable property interest in a state licence, the Ninth Circuit has noted:

> At one pole, a state operating license that can be revoked only "for cause" creates a property interest. *See, e.g., Barry v. Barchi*, 443 U.S. 55, 64, 99 S. Ct. 2642, 61 L.Ed.2d 365 (1979). At the opposite pole, a statute that grants the reviewing body unfettered discretion to approve or deny an application does not create a property right. *See, e.g., Jacobson v. Hannifin*, 627 F.2d 177, 180 (9th Cir. 1980). Whether a statute creates a property interest in the renewal of an existing operating license falls somewhere in the middle of those extremes. The answer to that question depends on "the extent to which the [governing] statute contains mandatory language that restricts the discretion of the [reviewing body] to deny [renewal] to applicants who claim to meet" the statutory requirements. *Id*. In other words, if the governing statute directs that a license shall be renewed upon compliance with certain criteria, none of which involve the exercise of discretion by the reviewing body, the licensee has a property right in the reissuance of the license. *See Stauch v. City of Columbia Heights*, 212 F.3d 425, 430 (8th Cir. 2000); *Foss*, 161 F.3d at 588. Conversely, an applicant does not have a property interest in the renewal of a license if the reviewing body has discretion to deny renewal or to impose licensing criteria of its own creation. *See Jacobson*, 627 F.2d at 180.

*Thornton v. City of St. Helens*, 425 F.3d 1158, 1164-65 (9th Cir. 2005).

Here Defendants do not address and, in fact, appear to concede that PP&M's assertion that the provisions of Oregon Revised Statutes Title 471, like those described in *Thornton*,

38 - OPINION AND ORDER

direct "that a license shall be renewed upon compliance with
certain criteria, none of which involve the exercise of
discretion by the reviewing body, the licensee has a property
right in the reissuance of the license," and, therefore, those
provisions create a protectable property interest in the
retention of an OLCC license by PP&M.

   C.   **Property interest in business goodwill.**

        PP&M also contends it has a protectable property
interest in the goodwill of Nookie's.  PP&M relies on *Soranno's
Gasco v. Morgan*, 874 F.2d 1310 (9th Cir. 1989), to support its
contention.  In *Sorrano's Gasco* the defendants, county officials,
suspended the plaintiff's bulk permits and then sent letters to
the plaintiff's customers informing them that the plaintiff's
bulk permits were suspended and that the plaintiff could not
lawfully deliver gasoline while under suspension.  *Id.* at 1313.
The letters also threatened to revoke the customers' permits if
the customers continued to receive gasoline from the plaintiff.
*Id.*  The plaintiff brought an action under § 1983 alleging the
defendants deprived the plaintiff of its property interest in
business goodwill.  The district court held the plaintiff did not
have any property interest in uninterrupted permits and that the
plaintiff's alleged injury to reputation alone was not sufficient
to establish a protected liberty interest.  *Id.* at 1316.  The
district court, however, did not address the plaintiff's alleged

39 - OPINION AND ORDER

property interest "in the goodwill of [its] business."  *Id*.  The Ninth Circuit noted California recognizes business goodwill as a property interest under state law and, therefore, concluded the goodwill of the plaintiff's business was "a property interest entitled to protection" under the Due Process Clause of the United States Constitution.  *Id*.

PP&m asserts Oregon courts have recognized "claims for damages to the goodwill of a business," and, therefore, PP&M's goodwill in Nookie's is a protectable property interest.  Under Oregon law, "a business will normally have a value, 'over and above the value of its assets, known as goodwill value.'"  *In re Marriage of McDuffy*, 184 Or. App. 359, 365 (2002)(quoting *In the Matter of Marriage of Maxwell*, 128 Or. App. 565, 568 (1994)).  Oregon courts have generally defined goodwill as the

> "favor or advantage in the way of custom that a business has acquired beyond the mere value of what it sells whether due to the personality of those conducting it, the nature of its location, its reputation for skill or promptitude or any other circumstance incidental to the business and tending to make it permanent.  Webster's Third New Int'l Dictionary, 979 (unabridged ed 1993)."

*Id*. (quoting *Weakley and Weakley*, 177 Or. App. 363, 368-69 (2001)).  "Oregon courts[, however,] have declined to assign a value for goodwill when there is no evidence in the record that any goodwill exists."  *Id*. (citation omitted).

Here PP&M does not identify in the record any evidence of goodwill value that exists as to Nookie's.  Under Oregon law,

40 - OPINION AND ORDER

PP&M's general assertion that Nookie's has goodwill is not sufficient to establish that such alleged goodwill is a protectable property right.  On this record, therefore, the Court concludes PP&M has not established it has a protectable property interest in the alleged goodwill of Nookie's to form the basis for a claim of deprivation of a property right in violation of the Due Process Clause of the United States Constitution.

   D.   **Deprivation of a property interest**.

        Defendants also contend PP&M has not established it was actually deprived of its property interest in its liquor license because the OLCC never revoked, suspended, cancelled, or refused to renew Nookie's liquor license.  PP&M, in turn, relies on *Reed v. Village of Shorewood*, 704 F.2d 943 (7th Cir. 1983), to support its contention that it suffered a deprivation of its property interest in its liquor license.

        In *Reed* the plaintiffs owned a bar and a liquor license.  After renewing the plaintiffs' liquor license for three years, plaintiffs alleged the defendants (a police officer, the police chief, many city officials, and the Village of Lansing) began to harass the plaintiffs by "arresting customers and employees on baseless charges, demanding proof of age from customers who obviously were many years over the legal drinking age, and bringing groundless proceedings to take away their Class A license."  704 F.2d at 947.  The plaintiffs alleged the mayor,

41 - OPINION AND ORDER

who was also the local liquor-control commissioner, suspended the
plaintiff's liquor license for 30 days for alleged infractions of
the Village's liquor-control ordinance.  On appeal to the
Illinois Liquor Control Commission (ILCC), the suspension was
reduced to five days.  Then, according to the plaintiffs, the
mayor and the Village Board of Trustees passed an ordinance
reducing the number of Class A liquor licenses in the Village
from four to three and informed the plaintiffs that their license
would not be renewed.  The plaintiffs appealed to the ILCC, which
reversed the denial of a renewed license, held the plaintiffs
were entitled to a hearing before a decision was made, and
granted the plaintiffs a stay to enable them to continue
operating under their expired license.  A hearing was never held
on remand.  Instead the mayor revoked the plaintiffs' license on
other allegedly "trumped up" charges.  Again the ILCC reversed.
The following year the defendants, without a hearing, again
refused to renew the plaintiffs' license and were again reversed.
At that point the plaintiffs tried to sell their business, but
the defendants interfered with their efforts and eventually the
plaintiffs had to shut down their bar and surrender their liquor
license.  *Id*. at 947.  The plaintiffs brought an action pursuant
to § 1983 alleging, among other things, that the defendants
deprived them of their property without due process.  The trial
court dismissed the complaint on the basis that, among other

42 - OPINION AND ORDER

things, the defendants did not deprive the plaintiffs of their
liquor license.  *Id*. at 948.  The Seventh Circuit reversed on the
following grounds:

> The defendants never succeeded in taking away the
> plaintiffs' license either by revocation or
> nonrenewal; their efforts to do so were thwarted
> by the Illinois Liquor Control Commission; and
> though the brief suspensions were deprivations,
> *see North Georgia Finishing, Inc. v. Di-Chem,
> Inc.*, 419 U.S. 601, 606, 95 S. Ct. 719, 722, 42 L.
> Ed. 2d 751 (1975), they were not denials of due
> process.  But "deprive" in the due process clause
> cannot just mean "destroy."  If the state prevents
> you from entering your house it deprives you of
> your property right even if the fee simple remains
> securely yours.  A property right is not bare
> title, but the right of exclusive use and
> enjoyment.  So if it is true as alleged that
> through harassment of customers and employees and
> relentless, baseless prosecutions the defendants
> destroyed the value of the plaintiffs' licensed
> business and forced them ultimately to give up
> their Class A license, the plaintiffs were
> deprived of their property right in the license
> even though the license was never actually
> revoked.

*Id*.

        The circumstances in *Reed,* however, are notably
distinguishable from the facts in this case.  In *Reed* the
defendants "destroyed the value of the plaintiff's licensed
business and forced them ultimately to give up their . . .
license."  Here PP&M does not identify any evidence in the record
that shows the value of its business has been lessened, much less
destroyed, nor does PP&M point to any evidence of lost profits or
unsuccessful efforts to sell Nookie's.  Moreover, PP&M does not

cite any case in which a court has held a plaintiff was deprived of its property rights in violation of the Due Process Clause when the plaintiff did not actually lose a license, lose its business, lose profits, or lose money on the sale of the business.

On this record the Court concludes PP&M has not established Defendants deprived it of a property interest in violation of the Due Process Clause of the United States Constitution.  Accordingly, the Court also grants Defendants' Motion for Summary Judgment as to PP&M's claim for deprivation of a property interest in violation of the Due Process Clause.

**IV.  Plaintiffs' § 1983 claim for deprivation of their liberty in violation of their right to procedural due process.**

Plaintiffs allege Defendants violated the Due Process Clause of the United States Constitution when they (1) deprived Plaintiffs of their liberty interest in operating Nookie's and (2) significantly impaired Westwood's reputation by "initiating and causing [Westwood] to be cited and prosecuted for an alleged violation of ORS 162.235."

**A.  Real party in interest.**

As noted, PP&M is the owner of Nookie's.  Accordingly, to the extent that Westwood and Myers bring a claim for violation of their right to due process with respect to a liberty interest in operating Nookie's, the Court grants Defendants' Motion for Summary Judgment because PP&M is the only real party in interest

44 - OPINION AND ORDER

as to this portion of Plaintiffs' claim for deprivation of a
liberty interest.

**B.    PP&M's liberty interest in operating Nookie's.**

PP&M asserts Defendants "sought to remove or
significantly impair [PP&M's] liberty interest in operating"
Nookie's in violation of PP&M's right to procedural due process.
PP&M relies on *Roth*, *Chalmers v. City of Los Angeles*,
762 F.2d 753 (9th Cir. 1985), and *Bollow v. Federal Reserve Bank
of San Francisco*, 650 F.2d 1093 (9th Cir. 1981), to support its
contention that PP&M has a protectable liberty interest in
operating Nookie's.  The Court notes, however, these cases
involve either public employees who were not being rehired for a
government position or general allegations of violations of due-
process rights without an analysis as to whether the due-process
violation is based on a liberty or a property interest.

For example, in *Roth* the city defendant hired the
plaintiff as an untenured professor for a one-year term.  The
defendant declined without explanation to renew the plaintiff's
employment after his one-year term ended.  The plaintiff brought
an action alleging, among other things, that the defendant
deprived him of his due-process rights because the defendant
failed to advise the plaintiff of the reason for the decision not
to rehire him.  408 U.S. at 566-68.  The court held the plaintiff
did not have a constitutional right to a statement of reasons or

45 - OPINION AND ORDER

a hearing on the defendant's decision not to rehire him.

> While this court has not attempted to define with
> exactness the liberty . . . guaranteed (by the
> Fourteenth Amendment), the term has received much
> consideration and some of the included things have
> been definitely stated.  Without doubt, it denotes
> not merely freedom from bodily restraint but also
> the right of the individual . . . to engage in any
> of the common occupations of life.
>
> * * *
>
> There might be cases in which a State refused to
> re-employ a person under such circumstances that
> interests in liberty would be implicated.  But
> this is not such a case.
>
> The State, in declining to rehire the respondent,
> did not make any charge against him that might
> seriously damage his standing and associations in
> his community. . . .  Had it done so, this would
> be a different case.  For where a person's good
> name, reputation, honor, or integrity is at stake
> because of what the government is doing to him,
> notice and an opportunity to be heard are
> essential.  In such a case, due process would
> accord an opportunity to refute the charge before
> University officials.

*Id*. at 572-73 (internal quotations omitted).

In *Bollow* the governmental defendant terminated the

plaintiff after eleven years as a regulatory attorney.  The

plaintiff filed an action alleging, among other things, that the

defendant violated his due-process rights.  The trial court

granted the defendant's motion for summary judgment on the ground

that the plaintiff's termination "implicated no constitutionally

protected property or liberty interest."  650 F.2d at 1096.  The

Ninth Circuit affirmed and noted the reasons for the plaintiff's

46 - OPINION AND ORDER

termination were never publicly disclosed.  The court found:

> The liberty protected by the due process clause of
> the fifth and fourteenth amendments encompasses an
> individual's freedom to work and earn a living.
> Thus, when the government dismisses an individual
> for reasons that might seriously damage his
> standing in the community, he is entitled to
> notice and a hearing to clear his name. . . .  To
> implicate constitutional liberty interests,
> however, the reasons for dismissal must be
> sufficiently serious to "stigmatize" or otherwise
> burden the individual so that he is not able to
> take advantage of other employment opportunities.
>
> This court has described the stigma that infringes
> liberty interests as that which "seriously damages
> a person's reputation or significantly forecloses
> his freedom to take advantage of other employment
> opportunities " *Jablon v. Trustees of Calif.
> State Colleges*, 482 F.2d 997, 1000 (9th Cir. 1973)
> (emphasis added), *cert. denied*, 414 U.S. 1163, 94
> S. Ct. 926, 39 L. Ed. 2d 116 (1974).  Subsequent
> panels have set the boundary of liberty interests
> at accusations of "moral turpitude," such as
> dishonesty or immorality *i.e.*, charges that do not
> reach this level of severity do not infringe
> constitutional liberty interests.  *See, e.g.,
> Stretten v. Wadsworth Veterans Hosp.*, 537 F.2d
> 361, 365-66 (9th Cir. 1976); *Gray v. Union County
> Intermediate Ed. Dist.*, 520 F.2d 803, 806 (9th
> Cir. 1975).  *See also Board of Regents v. Roth,
> supra*, 408 U.S. at 573, 92 S. Ct. at 2707.  Thus,
> in both *Stretten* and *Gray* it was held that
> dismissal for reasons of incompetence and
> inability to "get along" with co-workers did not
> infringe liberty interests.  537 F.2d at 366; 520
> F.2d at 806; *accord Weathers v. West Yuma County
> Sch. Dist. R-J-1*, 530 F.2d 1335 (10th Cir. 1976).

*Id*. at 1100-01.

In *Chalmers* a street vendor of T-shirts filed an action

under § 1983 alleging she was "harassed, threatened with arrest

and prosecution, and ultimately prevented from selling the

47 - OPINION AND ORDER

T-shirts by Los Angeles police officers who contended the sale
was illegal under section 42.00 of the Los Angeles Municipal
Code" in deprivation of the plaintiff's right to due process.
762 F.2d at 756.  The Ninth Circuit held the defendant violated
the plaintiff's right to due process because the Municipal Code
section on which the police officers relied conflicted with other
code provisions and was inconsistently applied.  The court noted
"absent a valid regulation of such activities, [the plaintiff]
had a right protected by the due process clause to engage in
[the] occupation [of selling T-shirts]."  *Id*. at 757.

        PP&M does not point to any Ninth Circuit case in which
the court has concluded the plaintiff established the defendant
violated the plaintiff's due-process right to a liberty interest
in the context of the right to operate a business.[3]  It is
questionable, therefore, whether the Ninth Circuit would
recognize such a protectable liberty interest.  The Court,
however, need not decide whether such an interest is recognized
in this Circuit because the Court concludes below that PP&M has
not established it has been deprived of a liberty interest in

---

        [3] Although it is not directly on point, the Ninth Circuit
has noted "the liberty interest in pursuing one's chosen
profession has been recognized only in cases where (1) a
plaintiff challenges the rationality of government regulations on
entry into a particular profession . . . or (2) a state seeks
permanently to bar an individual from public employment."  *Guzman
v. Shewry*, 552 F.3d 941 (9th Cir. 2009).

operating Nookie's even if such an interest exists.

**C.   Deprivation of PP&M's liberty interest in the operation of Nookie's.**

As noted in *Roth* and *Bollow,* injury to reputation alone is not sufficient to establish deprivation of a liberty interest under the Due Process Clause.  The Ninth Circuit has explained:

> [R]eputational harm alone does not suffice for a constitutional claim.  424 U.S. at 702, 96 S. Ct. 1155.  Rather, to support a claim under § 1983, [the plaintiffs] must show that the stigma was accompanied by some additional deprivation of liberty or property.  *Id.* at 708-09, 96 S. Ct. 1155.  We refer to this as the "stigma-plus" test, and have held that the "plus" must be a deprivation of liberty or property by the state that directly affects the plaintiff's rights. *Cooper v. Dupnik*, 924 F.2d 1520, 1533 (9th Cir. 1991).

*Miller v. Cal.*, 355 F.3d 1172, 1177 (9th Cir. 2004).

Here PP&M fails to establish the alleged injury to Nookie's reputation with either the OLCC or with its customers was accompanied by some additional deprivation of liberty or property.  As noted, PP&M was never deprived of its liquor license nor has PP&M identified any evidence in the record that establishes it suffered a loss of profits or lost any other constitutionally protected interest in Nookie's.

Accordingly, on this record the Court concludes PP&M has not established Defendants violated any constitutionally protected liberty interest in violation of PP&M's right to due process.

**D.   Deprivation of Westwood's liberty interest in her reputation.**

Westwood alleges Defendants violated her liberty interest under the Due Process Clause when they impaired her reputation by initiating and causing her to be prosecuted for violation of Oregon Revised Statute § 162.235.   Defendants, however, assert injury to Westwood's reputation alone is not sufficient to establish a claim for violation of her due-process liberty interest, and, in any event, Westwood received adequate process through her state-court trial and acquittal for violation of § 162.235.

The Ninth Circuit has held "[a] person's liberty interest is implicated if the government levels a charge against him that impairs his reputation for honesty or morality." *Guzman v. Shewry*, 552 F.3d 941, 955 (9th Cir. 2009)(quoting *Erickson v. United States ex rel. Dep't of Health & Human Servs.*, 67 F.3d 858, 862 (9th Cir. 1995)).   In *Guzman* the court found the defendant's suspension of the plaintiff's employment "triggered [a due-process liberty interest] because it [was] predicated on the fact that [the plaintiff was] under investigation for fraud and abuse."   *Id*.

As noted, under Oregon law an individual violates § 162.235 when she "intentionally obstructs, impairs or hinders the administration of law or other governmental or judicial function by means of intimidation, force, physical or economic

50 - OPINION AND ORDER

interference or obstacle."  This provision does not require any element or indication of fraud or dishonesty nor does it impune an alleged violator's "reputation for honesty or morality." Accordingly, it is questionable whether Westwood's prosecution for violation of § 162.235 implicates any due-process liberty interest.

In addition, the Court noted in *Roth* that when "a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to [her], notice and an opportunity to be heard are essential. . . .  In such a case, due process would accord an opportunity to refute the charge."  408 U.S. at 573.  Here Westwood succeeded in the ultimate exercise of her due-process rights.  She challenged the charge at trial and was acquitted.  Westwood, therefore, received sufficient notice and an opportunity to be heard as to the charge against her, which is the process required under the Due Process Clause.

In summary, on this record the Court concludes Plaintiffs have not established Defendants deprived them of a constitutionally protected liberty interest in either PP&M's operation of Nookie's or in Westwood's reputation.  Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Plaintiffs' claims for deprivation of their due-process liberty interests.

51 - OPINION AND ORDER

**V.    Plaintiffs' equal-protection claim**.

Plaintiffs allege they were not "treated equally with other citizens of Hermiston in the operation of their business and in their treatment as licensees of the OLCC."  Plaintiffs allege the unequal treatment included "increased scrutiny, harassment of customers, employees, and owners, and false reports to the OLCC" in violation of their rights to equal protection under the United States Constitution.  In their Response to Defendants' Motion for Summary Judgment, Plaintiffs emphasize they are asserting a "class of one" theory of equal-protection.  Defendants, however, contend Plaintiffs have not established how they were treated differed from Defendants treatment of other similarly situated establishments in Hermiston, and, in any event, Defendants assert they had a rational basis for their actions.

The Ninth Circuit has noted the "class-of-one" theory of equal protection

> is unusual because the plaintiff in a "class of one" case does not allege that the defendants discriminate against a group with whom she shares characteristics, but rather that the defendants simply harbor animus against her in particular and therefore treated her arbitrarily. *See N. Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008)("When an equal protection claim is premised on unique treatment rather than on a classification, the Supreme Court has described it as a 'class of one' claim."[]) (citing *Olech*, 528 U.S. at 564, 120 S. Ct. 1073)). Such circumstances state an Equal Protection claim because, if a state actor classifies irrationally, the size of the group affected is constitutionally

irrelevant.  *Olech*, 528 U.S. at 564, 120 S. Ct.
1073.

*Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 592 (9th Cir. 2008).

> To succeed on [a] "class of one" claim, [the
> plaintiff] must demonstrate that [the defendants]:
> (1) intentionally (2) treated [the plaintiff]
> differently than other similarly situated property
> owners, (3) without a rational basis.
> *Willowbrook*, 528 U.S. at 564, 120 S. Ct. 1073;
> *North Pacifica LLC v. City of Pacifica*, 526 F.3d
> 478, 486 (9th Cir. 2008).  Although [the
> plaintiff] must show that [the defendants']
> decision was intentional, he need not show that
> [the defendants] were motivated by subjective ill
> will.  *Willowbrook*, 528 U.S. at 565, 120 S. Ct.
> 1073 (rejecting the interpretation that a
> plaintiff must allege that the governmental action
> was the result of subjective ill will in a "class
> of one" claim).

*Gerhart v. Lake County, Mont.*, No. 10-35183, 2011 WL 923381, at

*7 (9th Cir. Mar. 18, 2011).  "A class of one plaintiff must show

that the discriminatory treatment 'was intentionally directed

just at him, as opposed . . . to being an accident or a random

act.'"  *North Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486

(9th Cir. 2008)(quoting *Jackson v. Burke*, 256 F.3d 93, 96 (2d

Cir. 2001)).

Plaintiffs do not dispute the Court must analyze Defendants'

conduct using a rational-basis standard because neither a suspect

classification nor a fundamental right is implicated in this

matter.  *See, e.g., Pennell v. City of San Jose*, 485 U.S. 1, 14

(1988).

Plaintiffs point to 25 violations against OLCC licensees in

53 - OPINION AND ORDER

Hermiston between March 9, 2005, and April 2, 2010, "none of
which arose as a result of defendants' [*sic*] bringing matters to
the attention of the OLCC and none of which involved plaintiffs."
Plaintiffs rely on a summary chart created by Plaintiffs'
paralegal based on the OLCC's response to a subpoena issued to
the OLCC by Plaintiffs in which they sought information as to
"all OLCC enforcement actions against any OLCC licensee located
in Hermiston, Oregon between the dates of January 1, 2005 and
[May 25, 2010]." Decl. of Genna Banica at ¶ 1 and Ex. B. The
chart, however, does not identify the type of establishments
involved in the enforcement actions and, therefore, does not
establish the places of business referenced in the chart are
similarly situated to Nookie's. For example, in addition to
enforcement actions against establishments that include the word
"Tavern" in their name, the chart also notes enforcement actions
against establishments such as Columbia Basin Pizza Hut; Devin
Oil Col, Inc./Hermiston Shell; Powell-Christensen, Inc./Gotta
Stop Mini Mart; Laxmi Corp./Denny's Diner; Hattenhauer
Distributing Co.; and Shari's Management Corp./Shari's of
Hermiston. Plaintiffs do not point to any evidence in the record
that indicates the nature of these businesses or that establishes
those businesses are reasonable comparators of Nookie's.
Plaintiffs, therefore, fail to establish that Defendants treated
similarly situated businesses differently than they treated

Nookie's as to their reports to the OLCC. *See Johnson v.
Goddard*, No. CV-07-0175-PHX-FJM, 2007 WL 2701951, at *2 (D. Ariz.
Sept. 13, 2007)(citing *Nordlinger v. Hahn*, 505 U.S. 1, 10
(1992))("A plaintiff [alleging a violation of his right to equal
protection] must allege sufficient facts to indicate that his
comparators were similarly situated in all relevant respects.").

In addition, Plaintiffs' chart contains 27 entries even
though Plaintiffs assert in their Response that "there is
evidence" of 25 violations of OLCC regulations, "none of which
arose as a result of defendants bringing matters to the attention
of the OLCC." Moreover, 11 entries contain notes under the
heading "Agency/HPD Involvement," which suggests the HPD was
involved in the enforcement action. For example, the chart
reflects Big Smoke was subject to OLCC action on February 17,
2009, and April 2, 2010, and "OLCC (& an Officer Gene Wilson w/
HPD referenced)" appears under Agency/HPD Involvement. Banica
Decl., Ex. B at 1. Similarly, the chart reflects El Cazador was
subject to an OLCC enforcement action on December 21, 2007, and
"OLCC & HPD involved." Banica Decl., Ex. B at 1. The chart also
reflects 16 businesses in Hermiston were subject to OLCC
enforcement actions that did not involve the HPD. Plaintiffs,
however, do not identify any evidence in the record that explains
the particular circumstances for which these 16 establishments
were subject to OLCC action without involvement by the HPD or

that indicates the total number of establishments in Hermiston
that are OLCC licensees.  The Court, therefore, concludes
Plaintiffs have not established a genuine dispute of material
fact exists as to Defendants' alleged selective enforcement of
OLCC regulations against Nookie's.

Accordingly, the Court grants Defendants' Motion for Summary
Judgment as to Plaintiffs' equal-protection claim.

**VI.  Westwood's § 1983 claim for malicious prosecution.**

Westwood alleges Defendants initiated and prosecuted the
criminal charge of Obstructing Governmental or Judicial
Administration against Westwood "with the intent of depriving her
of her constitutional rights to procedural due process, equal
protection, right to petition the government for redress of
grievances, the right to pursue an occupation and freedom of
expression."

Defendants move for summary judgment as to Westwood's
malicious-prosecution claim on the grounds that (1) a § 1983
claim is not "cognizable if plaintiff has a state claim for
malicious prosecution" and (2) there is not any evidence that
Defendants acted with malice.

**A.    Availability of state remedy for malicious prosecution.**

Defendants contend a claim for malicious prosecution
under § 1983 is not available to Westwood because "process is
available within the state judicial systems to remedy such

wrongs"; *i.e.*, specifically, her state-law claim for malicious prosecution. *See, e.g., Bretz v. Kelman*, 773 F.2d 1026, 1031 (9th Cir. 1985). Although Westwood concedes the *Bretz* court held a claim for malicious prosecution under § 1983 is not generally available if there is an adequate remedy within the state system, she argues this case comes within the exception set out in *Bretz* and in *Usher v. City of Los Angeles*, 828 F.2d 556 (9th Cir. 1987), that allows a § 1983 malicious-prosecution claim when "a malicious prosecution is conducted with the intent to deprive a person of equal protection of the laws or is otherwise intended to subject a person to a denial of constitutional rights." *Bretz*, 773 F.2d at 1031. Here Westwood alleges Defendants initiated and prosecuted her with the intent to deny her various constitutional rights. Accordingly, for purposes of this analysis, the Court will assume Westwood's § 1983 malicious-prosecution claim falls under the exception set out in *Bretz* and *Usher,* and, therefore, Westwood has alleged a cognizable claim for malicious prosecution under § 1983.

**B.   Malicious prosecution standards under § 1983.**

To prevail on her § 1983 malicious-prosecution claim, Westwood "must show that the defendants prosecuted her with malice and without probable cause, . . . that they did so for the purpose of denying her equal protection or another specific constitutional right[,]" and that the underlying criminal action

terminated in her favor.  *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066, 1067 (9th Cir. 2004)(quoting *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995)).  *See also Lacy v. Cnty. of Maricopa*, No. CV-06-2865-PHX-GMS, 2008 WL 5397585, at *10 (D. Ariz. Dec. 24, 2008)(same).  "A plaintiff alleging malicious prosecution under section 1983 must . . . establish:  (1) the elements of the state law tort; and (2) an intent to deprive the plaintiff of a constitutional right."  *Evans v. Multnomah Cnty.*, No. 07-CV- 1532-BR, 2009 WL 1011580, at *11 (D. Or. Apr. 15, 2009)(quoting *Pankey v. City of Concord*, No. C-06-03737 JCS, 2008 WL 793873, at *7 (N.D. Cal. Mar. 24, 2008)).

"Malicious prosecution actions [under § 1983] are not limited to suits against prosecutors but may be brought, as here, against other persons who have wrongfully caused the charges to be filed."  *Awabdy*, 368 F.3d at 1066 (citing *Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1126-27 (9th Cir. 2002)).  Police officers, however, are not generally "liable for damages suffered by the arrested person after a district attorney files charges unless the presumption of independent judgment by the district attorney is rebutted."  *Blankenhorn v. City of Orange*, 485 F.3d 463, 482 (9th Cir. 2007).

> Ordinarily, the decision to file a criminal complaint is presumed to result from an independent determination of the prosecutor, and, thus, precludes liability for those who participated in the investigation or filed a report that resulted in initiation of proceedings.

> However, the presumption of prosecutorial
> independence does not bar a subsequent § 1983
> claim against state or local officials who
> improperly exerted pressure on him, knowingly
> provided misinformation to the prosecutor,
> concealed exculpatory evidence, or otherwise
> engaged in wrongful or bad faith conduct that was
> actively instrumental in causing the initiation of
> legal proceedings.

*Awabdy*, 368 F.3d at 1067.

A plaintiff may rebut the presumption of independent judgment by the district attorney "by showing, for example, that the prosecutor was pressured or caused by the investigating officers to act contrary to his independent judgment or that the investigating officers presented the prosecution with information known by them to be false." *Blankenhorn*, 485 F.3d at 482 (internal quotation omitted). "[A] plaintiff must provide more than an account of the incident in question that conflicts with the account of the officers involved." *Newman v. Cnty. of Orange*, 457 F.3d 991, 993-94 (9th Cir. 2006).

**C.  Analysis**

As noted, although other persons who have wrongfully caused charges to be filed may be liable for malicious prosecution under § 1983, those persons are not generally "liable for damages suffered by the arrested person after a district attorney files charges unless the presumption of independent judgment by the district attorney is rebutted." *Blankenhorn*, 485 F.3d at 482.

59 - OPINION AND ORDER

Here Deputy District Attorney Kemp submitted a
Declaration in which he testifies he "independently made the
decision to charge" Westwood because he "had probable cause to
believe [she] interfered with the police officer's attempt to
speak with witnesses." Decl. of Mark Kemp at ¶ 6. Although
Westwood contends Kemp's "self-serving" Declaration is not
adequate, she does not point to any evidence that Defendants
improperly exerted pressure on Deputy District Attorney Kemp,
knowingly provided misinformation to him, or concealed
exculpatory evidence. In addition, even though Westwood's
account of events differed from that of the reporting officers,
the Ninth Circuit has held "a plaintiff's account of the incident
in question, by itself, does not overcome the presumption of
independent judgment." *Newman v. County of Orange*, 457 F.3d 991,
994 (9th Cir. 2006)(citing *Sloman v. Tadlock*, 21 F.3d 1462, 1474
(9th Cir. 1994)). As the Ninth Circuit explained:

> Prosecutors generally rely on police reports - not
> suspect's stories-when deciding whether charges
> should be filed. We presume they rely on their
> independent judgment when deciding whether such
> reports warrant the filing of criminal charges,
> unless contrary evidence is presented. . . . A
> suspect's account of an incident, by itself, is
> unlikely to influence a prosecutor's decision, and
> thus, it cannot, by itself, serve as evidence that
> officers interfered with the prosecutor's
> decision.
>
> Indeed, [the plaintiff's] argument would
> effectively nullify the presumption entirely. We
> are hard-pressed to conceive of a malicious
> prosecution case in which the plaintiff's version

60 - OPINION AND ORDER

of events would not conflict with the arresting officer's account. In virtually every case, then, the presumption would be rebutted.

*Id.* at 995. On this record the Court concludes Westwood has not presented evidence sufficient to overcome the presumption of prosecutorial immunity.

In addition, the Court has already concluded with respect to Westwood's state-law claim for malicious prosecution that Westwood failed to establish that she was prosecuted without probable cause. *See also Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995)(the plaintiff did not meet her burden as to her malicious-prosecution claim because "[a]lthough she alleges that the defendants acted with intent to deprive her of constitutional rights, [the plaintiff] is unable to show that she was prosecuted without probable cause."). Because Westwood has not established the elements of a state-law claim for malicious prosecution, she also has not established a claim for malicious prosecution under § 1983. *See Evans*, 2009 WL 1011580, at *11.

Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Westwood's claim for malicious prosecution under § 1983.

**VII. Municipal liability for the City of Hermiston.**

Defendants seek summary judgment as to Plaintiffs' claims under § 1983 against the City of Hermiston on the grounds that Plaintiffs have not identified a policy, custom, or practice of

61 - OPINION AND ORDER

the City that deprived Plaintiffs of their constitutional rights as required by *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

Section 1983 liability of a local governing body arises only when "action pursuant to official . . . policy of some nature caused a constitutional tort" and not on the basis of *respondeat superior*. *Id.* at 691-94 (1978). "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur*, 475 U.S. at 479 (1986)(emphasis in original). Municipal "[l]iability may attach . . . only where the municipality itself causes the constitutional violation through 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *Ulrich v. City and Cnty. of San Francisco*, 308 F.3d 968, 984 (9th Cir. 2002)(quoting *Monell*, 436 U.S. at 694).

The circumstances in which "*Monell*" liability may be found under § 1983 are "carefully circumscribed." *Fuller v. City of Oakland,* 47 F.3d 1522, 1534 (9th Cir. 1995). The Ninth Circuit has noted:

> Showing a "longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity" is one way to establish municipal liability. *Jett v. Dallas*

> *Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S. Ct.
> 2702, 105 L. Ed.2d 598 (1989); *Hopper v. City of
> Pasco*, 241 F.3d 1067, 1083 (9th Cir. 2001). . . .
> There are, however, two other routes available for
> a plaintiff to establish the liability of
> municipal defendants:  (1) by showing that the
> decision-making official was, as a matter of state
> law, a final policymaking authority "whose edicts
> or acts may fairly be said to represent official
> policy" in the area of decision, *Monell*, 436 U.S.
> at 694, 98 S. Ct. 2018; *City of St. Louis v.
> Praprotnik*, 485 U.S. 112, 124, 108 S. Ct. 915, 99
> L.Ed.2d 107 (1988)(plurality); *Pembaur*, 475 U.S.
> at 480-81, 106 S. Ct. 1292; or (2) by showing that
> an official with final policymaking authority
> either delegated that authority to, or ratified
> the decision of, a subordinate.

*Ulrich*, 308 F.3d at 984-85.

Because Plaintiffs have not established they sustained any constitutional violation, there is not any basis for a *Monell* liability claim to proceed.  Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Plaintiffs' constitutional claims against the City of Hermiston.

**VIII. Qualified immunity of Chief Coulombe.**

Defendants assert Chief Coulombe is entitled to qualified immunity as to all of Plaintiffs' constitutional claims because "there is no evidence to suggest that he acted in violation of any clearly established law."

"The doctrine of qualified immunity shields government officials performing discretionary functions from liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Dunn v. Castro*, 621 F.3d 1196, 1198-99 (9th Cir. 2010).  Qualified immunity shields a government official "from suit when he or she 'makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [he] confronted.'"  *Smith v. Almada*, 623 F.3d 1078, 1083-84 (9th Cir. 2010)(quoting *Brosseau v. Haugen*, 125 S. Ct. 596, 599 (2004)).

The Ninth Circuit uses "a two-step analysis to determine whether the facts show that:  (1) the conduct of the [defendants] violated a constitutional right; and (2) the right that was violated was clearly established at the time of the violation." *Huff v. City of Burbank*, No. 09-55239, 2011 WL 71472, at *6 (9th Cir. Jan. 11, 2011)(citing *Saucier*, 533 U.S. at 201).

Here the Court already has concluded Chief Coulombe's conduct did not violate any of Plaintiffs' constitutional rights. Accordingly, the Court concludes Chief Coulombe is entitled to qualified immunity as to Plaintiffs' constitutional claims against him.

## CONCLUSION

For these reasons, the Court **GRANTS** Defendants' Motion (#92)

for Summary Judgment and **DISMISSES** this matter **with prejudice**.

IT IS SO ORDERED.

DATED this 15th day of April, 2011.


/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge

65 - OPINION AND ORDER